UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| THOMAS M. McDONALD, an individual, | Case No. 2:09-cv-01470-MMD-PAL |
| Plaintiff, | |
| v. | BENCH ORDER |
| | (Findings of Fact and Conclusions of Law) |
| STEVEN C. PALACIOS, an individual; SARAH NELSON, an individual; and PALACIOS FAMILY TRUST DATED MAY 10, 2006, | |
| Defendants. | |

I.    **SUMMARY**

This dispute arose from the sale of a business. The Court held a bench trial over the course of several weeks. This Order addresses the remaining claims presented at trial.

II.    **THE CLAIMS**

A.    **Direct Claims**

Plaintiff Thomas McDonald ("McDonald") asserts five claims against Defendants Steven C. Palacios ("Palacios"), the Palacios Family Trust Dated May 10, 2006 ("Trust") (collectively "the Palacios Parties") and Sarah Nelson ("Nelson"): (1) violation of the Securities and Exchange Act of 1934 pursuant to 10b-5 for fraud in the purchase and sales of securities (15 U.S.C. § 78j(b)); (2) violation of NRS § 90.570; (3) civil conspiracy; (4) negligent misrepresentation; and (5) fraud. (ECF No. 23.) Additionally, McDonald asserts a declaratory relief claim against the Palacios Parties, seeking a

1  declaration that McDonald has not been a stockholder in MSI Companies since May 28,

2  2008, and has no further obligation to the Palacios Parties pursuant to the Stock

3  Purchase Agreement ("Purchase Agreement"), the Promissory Note ("the Note"), the

4  Stock Pledge Agreement ("Stock Pledge") or any other agreement signed in connection

5  with the Purchase Agreement. (ECF No. 23 at 16–17.) The Court granted summary

6  judgment in favor of McDonald on his declaratory relief claim "only as to McDonald's lack

7  of further liability under the Purchase Agreement, the Stock Pledge, and the Promissory

8  Note.[1] (ECF No. 77.)

9  **B.    Counterclaims**

10  The Palacios Parties asserted the following counterclaims: (1) fraud; (2) civil

11  conspiracy; (3) breach of contract (relating to the Note and Escrow Agreement); (4)

12  breach of the implied good faith and fair dealing; (5) breach of the Employment

13  Agreement; (6) breach of the implied covenant of good faith and fair dealing; (7)

14  defamation; (8) unjust enrichment; (9) breach of the Purchase Agreement; (10)

15  conversion; (11) breach of guaranty; (12) indemnity/declaratory relief; (13) alter ego; (14)

16  breach of fiduciary duty; and (15) negligence.[2] (ECF Nos. 113, 114.)

17  Several of the counterclaims, through motion practice or at trial, were eliminated.

18  The Court granted summary judgment in favor of McDonald on the Palacios Parties'

19  claims for breach of contract relating to the Note (third claim) and the Purchase

20  Agreement (ninth claim). (ECF No. 77.) Because the claim for breach of the implied

21  covenant of good faith and fair dealing asserted in the fourth claim appears to be

22  premised on the Purchase Agreement, the Court's ruling applies to the fourth claim as

23  ///

24  ///

---

25  [1]The Court found that the parties did not present evidence of whether and when the stock was transferred back to the Palacios Parties. (ECF No. 77 at 6.)

26  [2]The Palacios Parties' counterclaims do not identify which agreement serves as

27  the predicate for their two claims for breach of the implied covenant of good faith and fair dealing. Based on the order in which these claims appear, the Court will treat these

28  claims as being premised on the agreement referenced in the immediately preceding claim.

well.[3] Finally, the Court dismissed the alter ego claim at trial. (ECF No. 202 at 88:20–89:24.)

Accordingly, the remaining counterclaims addressed in this order are: (1) fraud; (2) civil conspiracy; (5) breach of the Employment Agreement; (6) breach of implied covenant of good faith and fair dealing (Employment Agreement); (7) defamation; (8) unjust enrichment; (10) conversion; (11) breach of guaranty; (12) indemnity/declaratory relief; (14) breach of fiduciary duty; and (15) negligence.

## C.    Third-Party Claims

The Palacios Parties assert the following third-party claims against Brian Bailes ("Bailes"): fraud,[4] civil conspiracy, interference with contract (Employment Agreement), defamation, conversion, breach of fiduciary duty, and negligence.[5] (ECF Nos. 114, 115.)

The Palacios Parties assert third-party claims against Leonard Krick ("Krick") and United Business Brokers of Nevada, LLC ("UBB") (collectively referred to as "UBB"). (ECF Nos. 114, 115.) After motion practice, the only remaining claims against UBB are breach of fiduciary duty and negligence. (ECF No. 152.)

Krick and UBB assert a third party counterclaim for attorney fees and costs. (ECF No. 126 at 18.)

## III.    PRELIMINARY ISSUES

The majority of the claims between McDonald and the Palacios Parties rely on competing allegations of fraudulent conduct. Resolution of these factual allegations will

---

[3]The Palacios Parties concede this point as they do not identify this claim in the pre-trial brief. (ECF No. 175.)

[4]The Palacios Parties assert this same claim against Pacific Sun Nurseries, Inc. ("Pacific Sun") (ECF No. 114 at 12-13.) However, their trial brief does not address any claim against this entity. (ECF No. 175.) To the extent this claim has not been dismissed, it is dismissed for failure to prosecute.

[5]The Palacios Parties also assert third party claims against Barbara McDonald and Sharon Wishon ("Wishon"). (ECF No. 114.) During trial, the Court clarified that its order dismissing certain claims against McDonald equally applied to Barbara McDonald. (ECF No. 180.) Pursuant to the parties' stipulation, the Court dismissed the remaining third party claims against Barbara McDonald. (ECF No. 187.) The Palacios Parties' trial brief does not identify any claims against Wishon. (ECF No. 175.) Thus, to the extent claims against Wishon have not been dismissed, they are dismissed for failure to prosecute.

resolve these competing claims. For example, McDonald's claims are based on Palacios' and Nelson's alleged misrepresentation of MSI Companies' financial records to induce him to purchase MSI Companies' stock and to thereafter loan MSI Companies money. (ECF No. 23.) The Palacios Parties' fraud and civil conspiracy claims against McDonald and Bailes are based on allegations that they directed Wishon to manipulate MSI Companies' financial records by (1) reclassifying a loan to Pacific Sun to appear as a loan to Palacios; (2) creating an entry on MSI Companies' records to charge interest on "the loan" to Palacios; (3) "completely remove the inventory assets under the heading of 'California Lease Hold improvement'" for the purpose of diminishing the profits of MSI Companies to in turn reduce compensation owing to Palacios under the Employment Agreement. (ECF No. 113 at 20-21, 22.)

## IV.    FINDINGS OF FACT

Several of the parties' claims involve factual prerequisites that the Court finds have not been established by a preponderance of the evidence. Accordingly, in addition to laying out factual background the Court addresses both (1) the allegations and assertions that were essential to each party's claims and which were affirmatively proven by a preponderance of the evidence, and (2) the allegations and assertions that were essential to each party's claims but not proven at trial.

### A.    The Purchase Agreement

1.    On or about August 3, 2006, McDonald purchased one-hundred percent (100%) of the membership interest in Conrad Holdings, LLC ("Conrad Holdings") for the purchase price of $2,500,000.00. (ECF No. 171 at sect. II(a).)

2.    On or about August 3, 2006, Palacios, individually and on behalf of the Trust, and McDonald entered into an agreement (the " the Purchase Agreement") to purchase seventy-five percent (75%) of the stocks in MSI Companies[6] for

---

[6]The Companies consist of: (1) Mist Systems International, Inc.; (2) MSI Landscaping, Inc.; (3) MSI Companies, Inc.; (4) MSI Development, Inc.; (5) Pure Osmosis, Incorporated; (6) MSI Concrete Services, Inc.; (7) MSI Masonry Services, Inc.; (8) Sonoran Companies, Inc.; and (9) Pacific Sun Nurseries, Inc. (hereinafter collectively referred to as "MSI" or "MSI Companies").

$2,925,000.00. The shares in the MSI Companies were held in escrow until the Note was paid in full. Since McDonald stopped paying on the Note, the shares never came out of escrow. (ECF No. 171 at sect. II(b).)

3.      At first, McDonald was going to purchase the assets of MSI Companies and Conrad Holdings. The transaction changed to the purchase of one hundred percent (100%) of MSI Companies and one hundred percent (100%) of the membership interests in Conrad Holdings from the Palacios Parties. As the discussions continued and documents were drafted, the Palacios Parties and McDonald agreed that McDonald would purchase seventy-five percent (75%) of the common stocks in MSI Companies, one hundred percent (100%) of the membership interests of Conrad Holdings, and the Palacios Parties would still be a twenty-five percent (25%) shareholder in MSI Companies. (ECF No. 171 at sect II(c).)

4.      Escrow closed on August 7, 2006 (hereinafter referred to as "Closing"). (Exh. 611 at KRICK1420–1421.)

5.      Pursuant to the Purchase Agreement, McDonald made a down payment of $1,150,000.00 to Palacios and delivered a Promissory Note for $1,775,000.00 in favor of the Trust. (ECF No. 171 at sect. II(d).)

**B.      Events Preceding the Stock Purchase**

6.      Palacios, as President of MSI Companies, contacted UBB and spoke to Krick after receiving marketing material from UBB and Krick to sell the assets of MSI Companies. (ECF No. 171 at sect. II(r).)

7.      Palacios met with Krick and executed a document entitled "Letter of Authorization" on or about September 8, 2005. (ECF No. 171 at sect. II (s).)

8.      Krick and UBB were the business brokers representing only the seller, Palacios, in the sale of MSI Companies and Conrad Holdings to McDonald. (ECF No. 171 at sect. II(n).)

9.      Neither Krick nor UBB were licensed to conduct stock transactions. (ECF No. 171 at sect. II(o).) Krick and UBB informed Palacios on or about May 5, 2006,

and August 7, 2006, that they could not conduct stock transactions. (ECF No. 199 at 31:9–25; Exh. 803 at KRICK0124.)

10.     Before McDonald purchased the shares of MSI Companies and the membership interests in Conrad Holdings, Palacios and Nelson provided financial information to UBB and/or McDonald regarding MSI Companies and Conrad Holdings. (ECF No. 171 sect. II(e).)

11.     Krick prepared a "Business Opportunity Summary" for MSI Companies containing a list price of $5,060,000.00 based on the financial records provided to him. (ECF No. 199 at 9:2–11:22; Exh. 42 at PLTF01353–PLTF01407.)

12.     UBB provided McDonald with the Business Opportunity Summary on or about March 31, 2006. (ECF No. 212 at 11:17-22.)

13.     McDonald relied on the information presented in the Business Opportunity Summary to decide whether to make an offer to buy MSI Companies. (ECF No. 212 at 11:23-13:4.)

14.     McDonald also received financial statements from MSI Companies on or about March 31, 2006. These financial statements (hereinafter collectively referred to as "March 2006 Financial Statements") included:

- "MSI Companies Profit and Loss" collectively listing data for 12/31/2003,12/31/2004, 12/31/2005, 3/31/2006, and 2006 Annualized. (Exh. 36 at PLTF01301-PLTF01302.)
- "MSI Companies Owners Discretionary Cash Flow" collectively listing data for 12/31/2003, 12/31/2004, 12/31/2005, 3/31/2006, and 2006 Annualized. (Exh. 36 at PLTF01303.)
- "MSI Companies Comparative Balance Sheets" collectively listing data for 12/31/2003, 12/31/2004, 12/31/2005, 3/31/2006. (Exh. 36 at PLTF01305.)

///

///

- "MSI Companies Sources and Uses of Cash" collectively listing data for "Twelve Months 12/31/04", "Twelve Months 12/31/05", and "Three Months 12/21/06". (Exh. 36 at PLTF01304.)

15.     McDonald, in consultation with UBB, calculated an offer price based on the March 2006 Financial Statements. (ECF No. 212 at 20:5-26:1; Exh. 41 at PLTF01348–PLTF01352.)

16.     On or about April 28, 2006, McDonald made an offer of $4,800,000.00 to purchase the assets of MSI Companies by executing an "Offer for Purchase and Sale of Assets" on a form provided by UBB. (Exh. 39 at PLTF01344-PLTF01346.) Palacios did not accept this offer.

17.     On or about May 5, 2005, Krick prepared a document entitled "Proposed Basic Terms" that was signed by both McDonald and Palacios. (Exh. 823.) The terms set forth in this document changed the type of sale from the originally planned asset sale of MSI Companies to the sale of seventy-five percent (75%) of the common stocks in MSI Companies and one-hundred percent (100%) of the membership interests in Conrad Holdings, leaving the Palacios Parties as a twenty-five percent (25%) shareholder in MSI Companies.[7]

18.     While Palacios did not agree with the exact terms as outlined in the Proposed Basic Terms document, this document is substantially the terms that formed the documents memorializing the transactions which are the subject of this litigation.

19.     McDonald's attorney, Jeff Pratt, prepared documents to carry out the terms of the Proposed Basic Terms. (ECF No. 171 at sect. II(u).)

20.     Palacios was aware that Pratt was preparing the documents to complete the sale contemplated by the Proposed Basic Terms. (ECF No. 171 at sect. II(y)).

---

[7]The document listed the "Guaranteed price for $75% of MSI, Pacific Sun Nurseries, and PSN inventory" at $2.925 million based on a calculated $3.9 million "Total Value of MSI, PSN, and PSN Potted Inventory." (Exh. 823.) This figure is the $3.4 million McDonald and Hooker had previously calculated for the "Total Value of MSI and PSN cash flow" and a $500,000 estimated value of Pacific Sun's plant inventory.

21.     Palacios and McDonald initialed the March 2006 Financial Statements at closing on the sale transactions ("Closing"). (Exh. 542 at DEF00181–DEF00186.) Palacios warranted that the March 2006 Financial Statements "accurately reflect the financial condition of the Corporations through March 31, 2006," and that it was prepared in accordance with GAAP. (Exh. 29 at PLTF00434–PLTF00451.)

22.     Palacios and McDonald also initialed financial statements from MSI Companies' Quickbooks compiled on August 3, 2006. These financial statements (hereinafter collectively referred to as "August 2006 Financial Statements") included:

- "MSI Companies Balance Sheet As of August 3, 2006". (Exh. 542 at DEF 00187–DEF00190.)
- "MSI Companies Profit & Loss January 1 through August 3, 2006." (Exh. 542 at DEF00191–DEF00194.)

23.     Palacios warranted that since March 31, 2006, "there had not been any change in the financial condition or operations of Corporations, except changes in the ordinary course of business." (Exh. 29 at PLTF00434-PLTF00451.)

24.     At trial, McDonald identified the following changes between the March 31, 2006, and August 7, 2006, Financial Statements: (1) MSI Companies drew an additional $256,068.00 on the Community Bank line of credit;[8] (2) accounts payable increased by $254,399.00;[9] (3) notes payable increased by $303,415.00 related to vehicle acquisitions.[10] (Exh. 266 at EXP00007.)

25.     The Court cannot find by a preponderance of the evidence that Nelson made false representations regarding MSI Companies' financial condition or stability through manipulating the financial records.

///

_____

[8]This is reflected in both the August 3, 2006, and August 7, 2006, Financial Statements. (Exh. 266 at EXP00482.)

[9]This is reflected in the August 7, 2006, Financial Statements. As of August 3, 2006, notes payable had increased by $104,715.00. (Exh. 266 at EXP00482.)

[10]This is reflected in both the August 3, 2006, and August 7, 2006, Financial Statements. (Exh. 266 at EXP00481.)

- Nelson's job was chief estimator, but she was also involved in helping Palacios manage MSI Companies' other departments due to the nature of their relationship. (ECF No. 211 at 37:8–11.)

- The Court finds credible Mallory Moyes' ("Moyes") testimony that Nelson was not involved with MSI Companies' accounting department during the time Moyes was in charge of the department — from 2004 through May or June 2006 when Moyes terminated her employment with MSI Companies. (ECF No. 198 at 105:18-106:5.)

- There is evidence that Nelson did take on a larger role in managing MSI Companies' accounting department *after* Moyes left and until Wishon was hired as controller in September 2007. For example, Nelson had the administrative password for Quickbooks and she was referred to as MSI Companies' "bookkeeper" by their accountant.

- However, there is no evidence that Nelson made a false representation by manipulating MSI Companies financial records from May or June 2006 through August 2006, when McDonald and Palacios executed the Purchase Agreement.

- Most notably, McDonald decided to purchase MSI Companies, and calculated his offer price, based on the March 2006 Financial Statements, all while Moyes was still in charge of MSI Companies' accounting department. Maria Crowell specifically recalled gathering financial documents, which she later learned were for the sale, from Moyes. (ECF No. 197 at 224:19-226:25.)

- There is also no documentary evidence that Nelson made any false representation by manipulating MSI Companies' financial records, including Quickbooks, before McDonald purchased MSI Companies. For example, although Wishon attributed certain records and transactions to Nelson, when pressed, Wishon admitted that she was

only speculating that Nelson was the source of the records and transactions. (ECF No. 196 at 228:7-13.)

- After Palacios and McDonald executed the Purchase Agreement, there is evidence that Nelson was involved with writing off "bad debt" from 2004 and 2006 that would have appeared as an asset on the data provided to McDonald before the Closing. The Court does not find that this evidence is sufficient to establish that Nelson had any part in making the initial representations in the financial data provided to McDonald.

### C.    McDonald's Due Diligence

26.    Before the Closing, McDonald hired accountants to review the financial books and records of MSI Companies and Conrad Holdings. (ECF No. 121 sect. II(f).)

27.    Specifically, McDonald hired CPA Clifford Beadle ("Beadle") to conduct the due diligence. (ECF No. 195 at 7:17-20.)

28.    The purpose of Beadle's inquiry during due diligence was not to search for fraud or to perform a full audit of MSI Companies. (ECF No. 195 at 12:14–19.) Rather, McDonald instructed Beadle to "look at the current financial statements, to compare those back against the information he had been provided in March, to see if there had been any significant changes, and to make some inquiries as to the nature of the business and how it operated and just what it did and how it did its transactions." (ECF No. 195 at 7:22-8:2.)

29.    It would have been uncommon to conduct an audit of MSI Companies' financials due to their size. (ECF No. 195 at 8:9–23.)

30.    To determine MSI Companies' daily operations, a manager from Beadle's firm, Phillip Zhang, inquired with MSI Companies' bookkeeper on such things as how often MSI Companies reconciled its bank account and updated the accounts payable list, whether MSI Companies maintained supporting documentation for sales

and receivables, and how soon invoices were posted after they were received. (ECF No. 195 at 9:21-10:8.) Beadle supervised Philip Zhang's work. (ECF No. 195 at 28:16-20.)

31.     Beadle met with McDonald in May or June and reviewed McDonald's offer, as well as MSI Companies' March 2006 Financial Statements. (ECF No. 195 at 9:1-10.)

32.     A few days before the Closing, Beadle also reviewed MSI Companies August Financial Statements. (ECF No. 195 at 13:7–14:9.) Beadle compared this data with the March 2006 data to determine if the EBIDTA projection for 2006 was "significantly skewed or not achievable." (ECF No. 195 at 12:5-9; 47:6-17.) In comparing this financial data, Beadle determined that MSI Companies was on track to meet the 2006 annual projection. (ECF No. 195 at 14:16-19.)

33.     Beadle did not find anything in the financial information he reviewed that would cause him to believe it was inaccurate. (ECF No. 195 at 12:20-25.)

### D.     The Parties' Roles After the Closing

34.     McDonald was Director of MSI Companies, but did not work there on a daily basis. (ECF No. 212 at 69:9-10.)

35.     Bailes' position at MSI Companies was Vice President. (ECF No. 212 at 69:9-10.)

36.     Bailes was supposed to complete the process to become MSI Companies' Qualified Employee at the expiration of Palacios' term of employment, but failed to do so. (ECF No. 212 at 164:21-165:4.

37.     On August 7, 2006, Palacios entered into an Employment Agreement with MSI Companies. (Exh. 30 at PLTF00468-PLTF00481.) Palacios' term of employment was to be for two years starting on August 7, 2006, and ending on or about August 6, 2008. (Exh. 30 at PLTF00468.)

38.     Palacios' position at MSI Companies was President. (Exh. 30 at PLTF00469.)

///

39.     Palacios' duties as President of MSI Companies included: (1) mentoring and training McDonald and Bailes in the operation and management of MSI Companies; (2) managing MSI Companies day-to-day operations; and (3) developing and/or maintaining relationships with new and existing distributors, customers, and suppliers. (Exh. 30 at PLTF00469.)

40.     Palacios received a monthly salary of $12,500.00 pursuant to the Employment Agreement. In total, under the Employment Agreement, Palacios received at least nineteen monthly payments of $12,500.00, totaling at least $237,500.00. (ECF No. 171 at sect. II(k).)

41.     Pursuant to the Employment Agreement, Palacios was also entitled to a bonus for his first year of employment equal to fifty percent of the increase in annual cash flow over $1,350,000.00. (Exh. 30 at PLTF00471.)

42.     The last pay period for which Palacios received a paycheck was the week of May 19-24, 2008. (ECF No. 212 at 214:22-215:16.)

43.     Palacios was not terminated for "cause" under the Employment Agreement. This issue was disputed at trial. The Court finds that Palacios was not terminated for "cause" for the following reasons.

- The Employment Agreement provides that within Palacios' initial two-year term of employment "[t]he Board may terminate [Palacio's] employment with [MSI Companies] at any time for 'cause' (as defined below), immediately on written notice to [Palacios] of the circumstances leading to termination for cause."[11] (Exh. 30 at PLTF00474.)

- Palacios testified that on or about May 24, 2008, McDonald told him that would be his last paycheck. (ECF No. 212 at 207:11-14.) McDonald testified that he advised Palacios that he did not intend to continue

///

_____

[11]The Employment Agreement also covers "involuntary termination" at the end of Palacios' initial two-year term of employment, and termination because of disability or death; but these grounds are not relevant here.

lending MSI Companies' money, but he denies telling Palacios he was not going to issue him future paychecks, or terminating Palacios' employment. (ECF No. 212 at 70:8–13; 95:1–8.) Bailes also denies terminating Palacios' employment. (ECF No. 211 at 269:22-23.)

- The Court finds McDonald's and Bailes' version of events to be more credible. Palacios' only evidence of a termination is that he *believed* he was not going to receive a paycheck because McDonald was no longer going to infuse MSI Companies with money. This is not sufficient to establish "termination for cause" as defined by the Employment Agreement.

- Palacios cannot produce a written notice of termination for cause, as required by the Employment Agreement.

- The Court finds significant, during this time period, the lack of any reference to termination because Palacios understood that he could not quit within his initial two-year term of employment and still receive payment on the Note. (ECF No. 211 at 55:7-13.) For example, in the May 27, 2008 email notifying McDonald that he was removing himself as the qualified employee, Palacios acknowledges McDonald's May 22, 2008, statement that he would "no longer make any additional capital investments in MSI with the exception of payroll for three weeks." (Exh. 554 at DEF00356.) If McDonald had specifically told Palacios that he was not going to pay him after May 24, 2008, it is unclear to the Court why Palacios would not have at least referenced this in the email, rather than only noting McDonald's refusal to make future capital investments.

- The State of Nevada Department of Employment, Training and Rehabilitation determined that Palacios was entitled to unemployment benefits. (ECF No. 171 at sect. II(m).) However, for the reasons

explained above, the Court does not find this determinative of a termination for cause under the Employment Agreement.

44.    Palacios voluntarily resigned from his employment with MSI Companies on May 24, 2008 — before the expiration of his term of employment. This fact was disputed at trial. The Court finds that Palacios voluntarily resigned his employment.

- The Court finds that the last period Palacios worked at MSI Companies was the week of May 19-24, 2008.

- Palacios did not work the week of May 26, 2008, but only went to pick up his paycheck on or about May 30th, at which time he submitted retroactive sick leave requests. (ECF No. 202 at 92:7–15.)

- On or about May 30, 2008, Palacios submitted a leave request for two week vacation to start immediately. During this time, Bailes asked Palacios to return from vacation to assist with the MSI Companies, to no avail. (ECF No. 211 at 262:5–1418.)

- Palacios never returned to work at MSI Companies because, according to Palacios, he could not understand how McDonald could just "walk away" from MSI Companies and that the environment was "not friendly." (ECF No. 212 at 238:17-239:4.)

- On June 26, 2008, Palacios advised the Contractors Board that he "resigned as President [of MSI] on May 30th 2008."[12] (Exh. 112 at PLTF02940.)

45.    The Palacios Parties failed to establish MSI Companies' EBITDA during the time of Palacios' employment from August 7, 2006, through May 28, 2008, for

///

///

_____

[12]Palacios testified that he put May 30, 2008 in the letter because he received his last paycheck on that date. However, at trial, he clarified that the paycheck was for the week ending on May 24, 2008.

the purpose of determining Palacios' compensation under the Employment Agreement. The parties disputed at trial MSI Companies' EBITDA during this time period.

- David Chavez ("Chavez"), the Palacios Parties' expert, opined that, based on the information he had, he could not calculate MSI Companies' actual EBITDA because the Quickbooks information was unreliable due to the number of adjustments made by Wishon. Chavez testified that in order to obtain the actual figure, he would need to "recreate some kind of books[,]" which could be done, but would cost a "tremendous" amount of money. (ECF No. 201 at 227:2-14.) Instead, Chavez estimated MSI Companies' EBITDA at $1,500,000.00. (Exh. 605 at DEF00519-DEF00521.) Chavez based this estimate on the "Owners Discretionary Cash Flow" and "annualized profit and loss" statements from the Purchase Agreement executed by the parties on August 3, 2006. (Exh. 605 at DEF00520.)

- According to John Wightman ("Wightman"), McDonald's expert, Chavez's estimate is unreliable because MSI Companies' EBITDA during the relevant time period can be calculated based on GAAP. (Exh. 266 at EXP00005-EXP00009.) Wightman opined that MSI Companies reported losses for 2006 and 2007. (Exh. 267 at EXP000493–EXP000494.)

- The Court finds that the basis of Chavez's estimate is not credible for determining MSI Companies' actual EBITDA.

- In using the 2006 figures to establish his estimate, Chavez failed to account for (1) how, if at all, the move to more large-scale public works projects affected MSI Companies' cash flow (ECF No. 201 at 271:5-272:18) and (2) how, if at all, MSI Companies was impacted by the

///

///

downturn in the Las Vegas construction industry in 2007 and 2008.[13] (ECF No. 201 at 266:12–18).

- Even accepting Chavez's opinion that MSI Companies' Quickbooks information was unreliable, there was other information from the relevant time period Chavez could have used to more accurately calculate MSI Companies' cash flow and EBIDTA. Chavez testified that he asked for MSI Companies' tax returns and bank statements, but never received them for his initial report. (ECF No. 201 at 222:19-25; 225:6-22.) Chavez also admitted that the tax documents and bank statements could have assisted with his calculation to determine MSI Companies' true revenue or, at least, corroborate his estimates. (ECF No. 201 at 223:24-224:2; 265:7-15.)

- While the Court recognizes that a company can be profitable and still require credit, the Court finds credible Wightman's conclusion that McDonald's loans to MSI Companies corresponded with the debt incurred by MSI Companies. (ECF No. 197 at 56:5-57:8.)

46.    The Palacios Parties failed to establish that MSI Companies' annual cash flow was over $1,035,000.00 from August 7, 2006, through August 6, 2007, for the purpose of determining Palacios' bonus under the Employment Agreement.

- The parties disputed at trial MSI Companies' annual cash flow from August 7, 2006, through August 6, 2007.

- Chavez estimated MSI cash flow at $1,833,524.00 using the same method described above. (Exh. 605 at DEF00520-DEF00521.)

- Wightman opined that Chavez's estimate is unreliable and determined that MSI Companies actually generated a deficient cash flow, which he calculated "[us]ing the 2006 and 2008 federal income tax returns and

---

[13]For example, Wightman testified that during this time period construction companies obtained less work. (ECF No. 197 at 190:4-18.)

the Quickbooks Balance Sheet and Profit and Loss for the periods ended August 7, 2006, and December 31, 2007." (Exh. 267 at EXP000493–EXP000494.)

- For the reasons explained above, the Court finds that the basis of Chavez's estimate is not credible for determining whether MSI Companies' cash flow was over $1,035,000.00 from August 7, 2006, through August 7, 2007.

**E.     MSI Companies' Operations After the Closing**

47.     In 2006, Palacios changed the direction of MSI Companies by taking on larger public works projects in an attempt to "grow" the business.

- In the years before the Closing, MSI Companies focused its business on "smaller" private construction projects. (ECF No. 211 at 26:24-27:13; 95:25-96:5.)
- The public works projects were generally larger, longer in duration, and required more substantial upfront capital expenditures compared to the private contracts. (ECF No. 211 at 6:5-13.)
- In early 2006, MSI Companies bid the Pebble & Eastern public works project, was awarded the contract in late August 2006 or early September 2006, and began work after the Closing in October 2006. (ECF no. 211 at 167:10-168:8.)
- MSI Companies was awarded a contract as a subcontractor on the Centennial Hills project. (ECF No. 211 at 236:1-5.)

48.     Palacios was not "really familiar" with how to estimate and manage public works projects, nor did he have the required A License (general contractor) to complete these projects. (ECF No. 198 at 43:23-44:5.) Therefore, before the Closing, MSI Companies contracted with Tony Colagiovanni ("Colagiovanni"), who obtained an A License, for help with calculating bids and to act as MSI Companies' Qualifier to oversee the public works projects. (ECF No. 198 at 48:6-15.)

49.     Before the Closing, Palacios discussed with McDonald the "direction" he wanted to take the business. (ECF No. 212 at 16-202:10.)

50.     Although MSI Companies continued to be awarded contracts through 2008, any "profit" it received was used to cover operating expenses and upfront expenditures for other projects.

51.     MSI Companies experienced difficulties with proper billing and collecting on accounts receivable. (ECF No. 196 at 24;6-23; ECF No. 213 at 12:13-23.)

**F.     MSI Companies' Financial Issues Post Closing**

52.     Within a week of Closing, McDonald put in over $100,000.00 to MSI Companies. (ECF No. 171 at sect. II(g).)

53.     Between 2006 and 2008, McDonald loaned at least $1.5 million to MSI Companies.[14] (ECF No. 171 at sect. II(h).)

54.     In May 2007, MSI Companies obtained a line of credit with Nevada State Bank. Palacios and McDonald, as well as Barbara McDonald, all personally guaranteed this line of credit. (ECF No. 212 at 76:1-23.)

- MSI Companies used the Nevada State Bank line of credit, which McDonald describes as a "re-finance," to repay MSI Companies' Community Bank Line of credit that existed before the Closing.

- McDonald eventually purchased the note from Nevada State Bank. (ECF No. 212 at 102:5-9.)

55.     By late 2007, McDonald had become increasingly concerned with MSI Companies' apparent financial issues and was advised by his accountant, Robert Evans, to hire "somebody who had an accounting background to try and get the books — get the accounting under control." (ECF No. 213 at 125:24-126:7.)

///

///

_____

[14]McDonald asserts that McDonald loaned well over $2 million, but the Palacios Parties contend that McDonald loaned approximately $1.5 million to MSI Companies.

56.     In or about September 2007, Wishon, a certified public accountant, was interviewed and hired as a controller for MSI Companies, to review, monitor, and perform the accounting for MSI Companies. (ECF No. 171 at sect. II(i).)

57.     Once Wishon was employed with MSI Companies, she started to modify MSI's Quickbooks to reconcile them with the financial books and tax returns.

58.     The Court cannot find by a preponderance of the evidence that McDonald and/or Bailes formed an agreement with Wishon to adjust MSI Companies' financial records for the purpose of cheating Palacios under the Employment Agreement.

- There is no direct evidence of such an agreement. The Court finds credible McDonald's and Bailes' testimony that neither instructed Wishon to make changes to MSI Companies' financial records. (ECF No. 212 at 92:7-24; ECF No. 211 at 249:1-23.)

- The Palacios Parties also failed to produce evidence from which the Court can reasonably infer an agreement to harm Palacios.

- Wishon's responsibilities as controller were to review and perform an accounting of the financial records to "figure out what was going on" and to prepare monthly financial statements. (ECF No. 195 at 240:22–242:15.)

- Wishon acted consistent with her responsibilities as MSI Companies' controller as she understood them. The Court finds credible Wishon's testimony that she independently adjusted the records because she believed they were not being properly maintained according to GAAP. (ECF No. 195 at 266:23-267:21.) The testimony at trial revealed that the adjustments Wishon made to the journal entries were consistent with conversions to the percentage of completion method, which is a more accurate method of determining monthly income for large-scale public construction projects. (*See* ECF No. 195 at 97:16-98:3; 183:22-184:10.)

- The Court finds credible Wishon's testimony that she did not know how Palacios' salary or bonus was calculated because she was not familiar with the Employment Agreement. (ECF No. 196 at 258:10-21.)

G.    **MSI Companies' Closing and Receivership**

59.    On or about May 28, 2008, McDonald submitted a written resignation as Director of MSI Companies and informed Palacios that he was defaulting on the Note. (ECF No. 171 at sect. II(j); Exh. 539 at DEF00167–DEF00169.)

60.    On May 27, 2008, Palacios requested that the Nevada State Contractors Board remove him as MSI Companies' qualified employee. (Exh. 595 at DEF00473.)

61.    MSI Companies ceased operations in June 2008. (ECF No. 196 at 35:20-23.)

62.    MSI Companies ceased operations because it had no money to move forward and it did not have a qualified employee after Palacios pulled his license. (ECF No. 196 at 36:2-9.)

63.    Bailes made both oral and written statements to the Nevada State Contractor's Board and MSI Companies' venders and co-workers that Palacios "abandoned" MSI Companies. (ECF No. 211 at 269:1-18.)

64.    McDonald sought a court order to have Wishon named as Receiver for MSI Companies and she was appointed Receiver on or about July 2, 2008. (ECF No. 171 at sect. II(l).)

V.    **CONCLUSIONS OF LAW**

A.    **McDonald's Direct Claims Against the Palacios Parties**

1.    **Reliance**

The basis of McDonald's Rule 10b-5, fraud, and negligent misrepresentation claims involves allegations that Palacios falsely represented MSI Companies' financial condition and stability by manipulating the financial records "before," "during," and "after" the Closing. These claims fail to the extent that they are based on allegations of false

representations "during" and "after" the Closing because McDonald has not established reliance.[15]

Specifically, McDonald alleges that Palacios misrepresented MSI Companies' value and stability "before" the sale by manipulating the March 2006 Financial Statements. McDonald alleges that "during" the sale, Palacios failed to disclose "Material Adverse" financial changes that occurred between March 31, 2006, and August 7, 2006. The parties disputed at trial whether the alleged misrepresentations "before" and "during" the sale should have been discovered by McDonald during the due diligence period.

Under Rule 10b-5, a plaintiff's reliance on a misrepresentation must be reasonable. "Justifiable reliance is a question of the reasonableness of the investor's behavior in accepting the truth of defendant's assertions." *In re Rexplore, Inc. Sec. Litig.*, 671 F. Supp. 679, 684 (N.D. Cal. 1987). Courts commonly examine the following characteristics to determine if reliance is justifiable: (1) plaintiff's sophistication in financial matter; (2) duration of business relationship involved; (3) availability of relevant information; (4) presence of fiduciary relationships; (5) the concealment of, and opportunity to discover, the fraud; (6) which party initiated, or wished to expedite, the transaction; and (7) the specificity of the misrepresentations. *Id.* Similarly, under Nevada law, a plaintiff must show justifiable reliance to prove claims of intentional and negligent misrepresentation. *Collins v. Burns*, 741 P.2d 819, 821 (Nev. 1987); *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1387 (Nev. 1998) (adopting Restatement (Second) of Torts § 552 definition of negligent misrepresentation). Justifiable reliance requires that the plaintiff does not have information "which would serve as a danger signal and a red light to any normal person of his intelligence and experience." *Collins*, 741 P.2d at 821.

As to the alleged misrepresentations contained in the March Financial Statements, the Court finds that McDonald's reliance on the records was reasonable and ///

---

[15]Representations made "after" the Closing appear to be directly related to those made "during" the Closing.

1  justified. McDonald had no reason to suspect any fraud and it appeared to him and

2  Beadle that MSI Companies' finances were in order.

3      As to the August Financial Statements, the Court finds that McDonald's reliance

4  on the records was not reasonable or justified. McDonald contends that the $256,068.00

5  draw on the Community Bank line of credit between March 31, 2006, and August 7,

6  2006, was a material adverse change or liability requiring disclosure under the Purchase

7  Agreement. (*See supra* Sect. (IV)(B)(24).) McDonald further argues that the credit draw,

8  in addition to the increases in accounts payable and notes payable created a

9  "substantial adverse impact on the value" of MSI Companies because there was less

10  credit available than McDonald expected based on the March Financial Statements,

11  thereby impeding MSI Companies' ability to operate without additional capital. McDonald

12  asserts that he "would not have realized that this material adverse change in the line of

13  credit had taken place because . . . closing is where one signs documents and one does

14  not do a line-by-line analysis of the financial records of the Companies." (ECF No. 210 at

15  19:1-4.) The Court disagrees.

16      The August Financial Statements McDonald and Palacios initialed at closing were

17  actually compiled on August 3, 2006, and Beadle reviewed them several days *before*

18  Closing. (Sect. (IV)(C)(32).) Moreover, the credit draw and increases in accounts

19  payable and notes payable are easily discoverable by comparing the March Financial

20  Statements with the August Financial Statements. The Court therefore believes that

21  McDonald himself could have conducted a line-by-line comparison of the records — and

22  discovered the changes — before August 7, 2006. Given McDonald's business acumen,

23  had he reviewed the financial statements he would have noticed the significant draw on

24  the line of credit and inquired further. It is also unclear to the Court why Beadle did not

25  discover the credit draw when his specific purpose was to compare the March Financial

26  Statements with the August Financial Statements. Accordingly, the Court finds that

27  McDonald's reliance on Palacios' representation that there were no material adverse

28  ///

changes or liabilities between March 31, 2006, and August 7, 2006, was not reasonable or justified.

In sum, McDonald has not established the reliance element in support of his Rule 10b-5, fraud, and negligent misrepresentation claims to the extent these claims involve allegations that Palacios falsely represented MSI Companies' financial condition "during" and "after" the Closing. The Court will next address these claims to the extent they are based on representations made "before" the Closing.

### 2.    Fraud in Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5.

Section 10 of the Securities Exchange Act of 1934 makes it unlawful to "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5, which implements the statute, makes it

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240,10b-5.

To recover for a violation of Section 10(b) and Rule 10b-5, a private securities plaintiff must prove the following elements by a preponderance of the evidence: "(1) material misrepresentation or omission, (2) scienter, (3) connection with the purchase or sale of a security, (4) reliance, often referred to as transaction causation; (5) economic loss, and (6) loss causation." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1118 (9th Cir. 2013) (citing *Dura Pharmaceuticals, Inc. v.*

*Broudo*, 544 U.S. 336, 341–42 (2005)). In addressing § 10(b) claims, and especially the loss causation element, the Ninth Circuit has recognized the difference between "typical" "fraud-on-the-market"[16] scenarios involving publically-traded securities and "non-typical" § 10(b) scenarios — such as is the case here — concerning shares of a privately held company or an "inefficient" market. *See WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1053 (9th Cir. 2011).

It is more difficult to categorize the required loss causation in a "non-typical" § 10(b) case because "[i]n the absence of a responsive market price, 'the factual predicates of loss causation fall into less of a rigid pattern.'" *Nuveen*, 730 F.3d at 1120 (quoting *McCabe*, 494 F.3d at 426)); *WPP Luxembourg Gamma*, 655 F.3d at1053 ("With a privately held company, a comparison of market stock price to establish loss causation has less relevance because market forces will less directly affect the sales prices of shares of a privately held company."). Notwithstanding, transaction causation and loss causation are still "distinct" elements that may not be merged. *Nuveen*, 730 F.3d at 1118. "Transaction causation constitutes 'actual' or 'but-for' cause." *Id.* (citing *In re Daou Sys. Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005)). "[I]t focuses on the time of the transaction and 'refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities.'" *Id.* (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2nd Cir. 2003)). "Loss causation is 'a causal connection between the material misrepresentation and the loss'" that requires the plaintiff to demonstrate "proximate" or "legal" cause. *Id.* at 1119 (quoting *Dura*, 544 U.S. at 342) "[A] plaintiff can satisfy loss causation by showing that the defendant

---

[16]As explained in *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425–26 (3rd Cir. 2007):

In a typical "fraud-on-the-market" § 10(b) action, the plaintiff shareholder alleges that a fraudulent misrepresentation or omission has artificially inflated the price of a publicly-traded security, with the plaintiff investing in reliance on the misrepresentation or omission; to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff.

misrepresented or omitted the *very facts* that were a substantial factor in causing the plaintiff's economic loss." *Id.* at 1120 (quoting *McCabe,* 494 F.3d at 425) (emphasis added in *Nuveen*). Whether a material misrepresentation or omission is a substantial factor in causing the economic loss "'includes considerations of materiality, directness, foreseeability, and intervening causes.'" *Id.* at 1123 (quoting *McCabe*, 494 F.3d at 436).

Here, the basis of McDonald's claim is that Palacios misrepresented MSI Companies' financial condition and stability through the financial records to fraudulently induce McDonald to purchase 75% of the stock in MSI Companies for a grossly inflated price. The Court finds credible McDonald's testimony that he would not have entered into the transaction but for the alleged fraudulent misrepresentations. However, the Ninth Circuit has "consistently rejected loss causation arguments like [McDonald's] — that a defendant's fraud caused plaintiff[] a loss because it 'induced [him] to buy the shares' — because the argument 'renders the concept of loss causation meaningless by collapsing it into transaction causation.'" *Id.* at 1121 (quoting *McGonigle v. Combs*, 968 F.2d 810, 821 (9th Cir. 1992)). It is not enough for McDonald to show that the alleged misstatements induced him to buy MSI Companies' stock at a price less favorable to him than he had been misled into believing. McDonald must also establish that the "revelation of the truth is directly related to the economic loss alleged." *Id.* at 1120 (quoting *WPP Luxembourg*, 655 F.3d at 1053)).

McDonald's economic loss occurred ultimately because of MSI Companies' cash flow issues, which resulted in McDonald's decisions to default on the Note and cease operations in June 2008. Even assuming *arguendo* that Palacios did fraudulently exaggerate MSI Companies' financial condition through the financial records, the Court cannot find by a preponderance of the evidence that the alleged misrepresentations were the proximate cause of McDonald's economic loss. At the time of Closing, there is no evidence that MSI Companies' financial condition was so dire that it was on the verge of failing within two years. Specifically, McDonald provides no evidence or testimony establishing a link between the misrepresentations regarding MSI Companies' financial

condition and the cause of McDonald's failed investment.[17] The Court finds the fact that MSI Companies changed its business direction substantially contributed to MSI Companies' cash flow issues and McDonald's failed investment. This is not attributable or even connected to the misrepresentations in MSI Companies' financial records. As such, McDonald fails to establish by a preponderance of the evidence that any misrepresentations contained within the financial records was the proximate cause of his economic loss. The Court will therefore find in favor of Palacios.

### 3.      Fraud and Negligent Misrepresentation

To succeed a claim of fraud in Nevada, a plaintiff must prove the following elements by clear and convincing evidence: (1) a false representation made by the defendant; (2) defendant's knowledge or belief that its representation was false or that defendant had an insufficient basis of information for making the representation; (3) defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation; (4) plaintiff's justifiable reliance upon the misrepresentation; and (5) damages to the plaintiff resulting from the reliance. *Bulbman, Inc. v. Nevada Bell*, 825 P.2d 588, 592 (Nev. 1992).

A claim of negligent misrepresentation requires that a plaintiff prove the following elements by a preponderance of the evidence: (1) a false representation made by defendant; (2) the representation was made in the course of the defendant's business; (3) the representation was for the guidance of others in their business transactions; (4) plaintiff's justifiable reliance upon the misrepresentation; (5) the reliance resulted in pecuniary loss to plaintiff; and (6) defendant failed to exercise reasonable care or competence in obtaining or communicating the information. *Ideal Elec. Co. v. Flowserve Corp.*, 357 F. Supp. 2d 1248, 1255 (D. Nev. 2005) (citing *Bill Stremmel Motors, Inc., v. First Nat'l Bank of Nevada*, 575 P.2d 938, 940 (Nev. 1978)).

///

---

[17]McDonald's expert opined only on economic loss — the impact of the misrepresentation on the purchase price — and not the proximate cause of the loss.

To prove both intentional misrepresentation and negligent misrepresentation, a plaintiff must establish that the defendant's misrepresentation proximately caused his damages. *Nelson v. Heer*, 163 P.3d 420, 426 (Nev. 2007) (listing elements of intentional misrepresentation claim); *Barmettler,* 956 P.2d at 1387 (listing elements of negligent misrepresentation claim). Nevada has adopted the Restatement (Second) of Torts' "substantial factor" test with regards to proximate causation. *See Holcomb v. Georgia Pac., LLC*, 289 P.3d 188, 196 (Nev. 2012). "Proximate cause limits liability to foreseeable consequences that are reasonably connected to both the defendant's misrepresentation or omission and the harm that the misrepresentation or omission created." *Nelson*, 163 P.3d at 225-26.

The Court finds that the same analysis as to proximate causation described above applies here because both Nevada law and § 10(b)'s element of loss causation apply the substantial factor test in determining legal cause. *See McCabe*, 494 F.3d at 438-39 (applying "general" causation principles to §10(b) and common law fraud and negligent misrepresentation claims). Accordingly, for the same reasons that McDonald failed to establish proximate causation for his § 10(b) claim, he also failed to establish proximate causation for his fraud and negligent misrepresentation claims. The Court will therefore enter judgment in favor of Palacios on both claims.

### 4.    Violation of NRS § 90.570

While the statutory language in NRS § 90.570 is similar to that of Section 10b-5, this statute is inapplicable here because it relates to state enforcement of securities fraud actions and not private civil enforcement. In fact, the Nevada Supreme Court specifically held that NRS §§ 90.570(2) and (3)

> should not be interpreted consistently with Rule 10b-5 because the federal statute deals with private party civil actions, not state enforcement actions. The underlying policy of the Nevada Uniform Securities Act is to prevent unnecessary loss to investors. If the Division were required to wait until an investor relies on untrue statement[s] of a material fact in order to enjoin securities fraud, then the purpose of securities regulations would be frustrated. The Division must be able to enjoin suspected securities fraud before an investor relies on the fraud to his or her detriment.

27

*Sec'y of State v. Tretiak*, 22 P.3d 1134, 1140 (Nev. 2001) (internal quotation marks omitted). Because NRS § 90.570 does not provide for a private cause of action, McDonald's claim fails. The Court will therefore enter judgment in favor of Palacios.

### 5.    Civil Conspiracy

Under Nevada law, "[a]ctionable civil conspiracy arises where two or more persons undertake some concerted action with the intent 'to accomplish an unlawful objective for the purpose of harming another,' and damage results." *Guifoyle v. Olde Monmouth Stock Transfer Co., Inc.*, 335 P.3d 190, 198 (Nev. 2014) (en banc) (quoting *Consol. Generator–Nevada, Inc. v. Cummins Engine Co.*, 971 P.2d 1251, 1256 (Nev. 1998)). "Thus, a plaintiff must provide evidence of an explicit or tacit agreement between the alleged conspirators" for the purpose of harming the plaintiff. *Id.* (citation omitted). While direct evidence of an agreement is not required, the plaintiff must at least present "circumstantial evidence from which to infer an agreement between [the parties] to harm [plaintiff]." *Id.* at 199 (citation omitted).

Here, McDonald alleges that Nelson, in coordination with Palacios to overvalue MSI Companies and induce McDonald to enter into the Agreement, misrepresented MSI Companies' financial data by manipulating MSI Companies' Quickbooks. There is no direct evidence of an agreement to harm McDonald. Rather, McDonald argues that an agreement should be inferred because Nelson was "heavily" involved with MSI Companies' accounting.

The Court cannot determine by a preponderance of the evidence that Nelson and Palacios agreed and intended to harm McDonald by misrepresenting MSI Companies' financial data. As explained *supra* in Section (IV)(B)(25), the Court cannot find by a preponderance of the evidence that Nelson made any false representation by manipulating the financial records on which McDonald relied as the basis for his offer to purchase MSI Companies. Accordingly, because there was no evidence that Nelson took any concerted action, the Court cannot reasonably infer that Palacios and Nelson ///

formed an agreement to harm McDonald. The Court will therefore enter judgment in favor of Palacios.

### 6.    Declaratory Relief

In the remaining part of his declaratory relief claim, McDonald seeks a declaration that he has not been a stockholder in MSI Companies since May 28, 2008. The Court finds that McDonald defaulted on the Promissory Note when he stopped making payments effective May 28, 2008. The shares in MSI Companies remained in escrow upon McDonald's default. (Sect. IV(A)(2).) Accordingly, McDonald has not been a shareholder in MSI Companies since May 28, 2008. The Court will therefore enter judgment in McDonald's favor.

### B.    McDonald's Direct Claims Against Nelson

The basis of McDonald's claims against Nelson is that she also made false representations regarding MSI Companies' financial condition and stability by manipulating the financial records provided to McDonald. As explained *supra* in Section (IV)(B)(25), the Court cannot find that Nelson made any false representation to McDonald regarding MSI Companies' financial condition or stability. The Court will therefore enter judgment in favor of Nelson on all of the claims asserted against her.

### C.    The Palacios Parties' Counter-Claims

#### 1.    Conspiracy-Based Claims

The Palacios Parties' civil conspiracy, fraud, and breach of the implied covenant of good faith and fair dealing claims are all based on an alleged conspiracy. Specifically, they allege that McDonald and/or Bailes conspired with Wishon to manipulate MSI Companies' financial records to defraud Palacios out of bonuses, which were tied to MSI Companies' EBITDA and annual cash flow, under the Employment Agreement. As explained *supra* in Section (IV)(F)(58), there is no evidence that McDonald and/or Bailes formed an agreement with Wishon to manipulate MSI Companies' EBIDTA or annual cash flow for the purpose of cheating Palacios under the Employment Agreement. The ///

1   Court will therefore enter judgment in favor of McDonald on the civil conspiracy, fraud,

2   and breach of the implied covenant of good faith and fair dealing claims.

### 2.   Breach of Employment Agreement

4          A breach of contract claim under Nevada law requires "(1) the existence of a valid

5   contract, (2) a breach by the defendant, and (3) damage as a result of the breach."

6   *Medical Providers Fin. Corp. II v. New Life Centers, LLC*, 818 F. Supp. 2d 1271, 1274

7   (D. Nev. 2011) (quoting *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919–20 (D. Nev.

8   2006)). The Palacios Parties argue that McDonald breached section 8 and section 9 of

9   the Employment Agreement.

10          In section 8 of the Employment Agreement, the parties agreed that Palacios "shall

11   receive total annual compensation in an amount equal to [25%] of the Company's

12   EBIDT[A]." (Exh. 508 at DEF00040-41 ¶ 8.) Moreover, McDonald agreed to pay Palacios

13   a "monthly base amount" of $12,500. (*Id.*) Thus, in order to prove a breach of section 8,

14   the Palacios Parties must establish MSI Companies' EBITDA for Palacios' term of

15   employment.

16          In section 9 of the Employment Agreement, the parties agreed that "[i]n addition to

17   the compensation provided for above, Employer shall pay to [Palacios] as incentive

18   compensation for the first year of employment, a sum equal to fifty (50%) percent of the

19   increase in annual cash flow of the Company over [$1.35 million]." (Exh. 508 at

20   DEF00041 ¶ 9) Thus, in order to prove a breach of section 9, Palacios must demonstrate

21   that MSI Companies' annual cash flow for Palacios' first year of employment was over

22   $1.35 million.

23          As explained *supra* in Sections (IV)(D)(45) and (46), the Palacios Parties failed to

24   establish MSI Companies' EBIDTA and annual cash flow. Without evidence of MSI

25   Companies' EBITDA and annual cash flow, the Palacios Parties cannot prove by a

26   ///

27   ///

28   ///

1   preponderance of the evidence that McDonald breached sections 8 or 9 of the

2   Employment Agreement.[18] The Court will therefore enter judgment in favor of McDonald.

3               **3.   Breach of Guaranty**

4       The Nevada Supreme Court has found that "general contract interpretation

5   principals apply to interpret guaranty agreements." *Mae v. Creagan*, 129 F. Supp. 3d

6   994, 997 (D. Nev. 2009) (citing *Dobron v. Bunch*, 215 P.3d 35, 37 (Nev. 2009)). The

7   Palacios Parties contend that McDonald breached the guaranty provided in Section 30

8   of the Employment Agreement by terminating Palacios and by failing to purchase

9   Palacios' remaining 25% interest in McDonald's capacity as the sole shareholder of MSI

10  Companies.

11      In the event that Palacios was terminated for cause under the Employment

12  Agreement, the parties agreed that "the Promissory Note payable to [Palacios] by

13  McDonald for the initial seventy five (75%) percent interest in the stock of the Company

14  will remain in full force and effect and McDonald shall purchase [Palacios'] remaining

15  twenty five (25%) percent interest in the stock of the Company consistent with the terms

16  of Section 30 herein."[19] (Exh. 508, DEF00044-45 ¶ 23.1.) Section 30 provides that

17  "[Palacios] shall sell and Company or the remaining shareholders shall buy all of

18  [Palacios'] remaining stock in the Company upon [Palacios'] termination of employment"

19  as determined by a formula based on EBITDA. (Exh. 508 at DEF00047 ¶ 30.)

20  Accordingly, the obligation in Section 30 of the Employment Agreement is triggered by

21  Palacios' employment termination for cause. However, as explained *supra* in Section

22  (IV)(D)(43), Palacios was not terminated for cause under the Employment Agreement.

23      The Palacios Parties additionally assert constructive discharge, contending that

24  McDonald forced Palacios to involuntary resign. Under Nevada law, "[a] constructive

25

26      [18]In accordance with the terms of the Employment Agreement, Palacios also received his $12,500 monthly salary through May 24, 2008.

27      [19]The Employment Agreement, however, does not contain an express guaranty of payment on the Promissory Note in the event that Palacios resigned from his employment within the initial two-year period.

28

discharge . . . exist[s] when an employer creates working conditions so intolerable and discriminatory that a reasonable person in the employee's position would feel compelled to resign." *Martin v. Sears, Roebuck & Co.*, 899 P.2d 551, 553 (Nev. 1995).

Even assuming *arguendo* that a constructive discharge could trigger Section 30's provision, as explained *supra* in Section (IV)(D)(44), the Court finds Palacios voluntarily resigned from his employment with MSI Companies. While Palacios could not understand how McDonald could just "walk away" from MSI Companies and, as such, the environment was "not friendly" to him, Palacios agreed to these terms. The evidence shows that this "unfriendly" environment culminated at the end of May 2008 when McDonald articulated that he was in fact going to "walk away" and Palacios realized that he did not want MSI Companies to revert back to his ownership. (*See* Exh. 554 at DEF00356.) The fact that Palacios *believed* he was not going to receive future paychecks because McDonald decided to "walk away" does not demonstrate that working conditions were so intolerable as to support a constructive discharge claim.

The Court finds that McDonald did not breach the guaranty provided by Section 30 of the Employment Agreement. The Court will therefore enter judgment in favor of McDonald.

### 4.    Unjust Enrichment

The elements of an unjust enrichment claim, or "quasi contract," include the following: "a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof." *Leasepartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 942 P.2d 182, 187 (Nev. 1997) (quotation omitted). A claim of unjust enrichment "is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement." *Id.* "The doctrine of unjust enforcement . . . applies to situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good

conscience and justice he should not retrain but should deliver to another or should pay for." *Id.* (quotation omitted).

Here, the Palacios Parties' unjust enrichment claim is governed by express, written contracts and, therefore, fails as a matter of law. First, the Palacios Parties insist that McDonald was unjustly enriched when he retained the compensation and bonus allegedly due to Palacios under the Employment Agreement. However, the Employment Agreement expressly provided for the amount of compensation and bonus Palacios would receive as President of MSI Companies. Accordingly, this theory of recovery is unavailable because an express, written contact governs Palacios' entitlement to compensation and a bonus.

The Palacios Parties advance an additional theory of liability on the monies McDonald received from the sale of MSI Companies' equipment and tools approximately two years after McDonald defaulted on the Promissory Note and MSI Companies closed. Specifically, they contend that "Palacios is entitled to twenty-five (25%) percent of the monies Mr. McDonald recovered from the sale of MSI equipment." (ECF No. 208 at 27:4-8.) However, this argument fails because McDonald's liability after default is likewise governed by express, written contracts — the Purchase Agreement and Stock Pledge. Moreover, the Court previously held that the Palacios Parties "have no recourse against McDonald's assets other than the stock pledged in this transaction and McDonald has no further liability under the Stock Purchase Agreement, the Stock Pledge Agreement, or the Promissory Note." (ECF No. 77 at 6:16-18.) Accordingly, the Palacios Parties' unjust enrichment claim fails as a matter of law because it is based on express, written contracts. The Court will therefore enter judgment in favor of McDonald.

### 5.    Conversion

"Conversion is a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights." *Evans v. Dean Witter Reynolds, Inc.,* 5 P.3d 1043, 1048 (Nev. 2000) (quotation omitted). Further, conversion is an act of

general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge. *Custom Teleconnect, Inc. v. Int'l Tele-Servs., Inc.,* 254 F. Supp. 2d 1173, 1182 (D. Nev. 2003). However, to be a conversion, an act "must be essentially tortious; a conversion imports an unlawful act, or an act which cannot be justified or excused in law." *Ferreira v. P.C.H. Inc.,* 774 P.2d 1041, 1043 (Nev. 1989) (quotation omitted).

The gist of Palacios Parties' conversion claim is that the Employment Agreement entitled Palacios to bonuses, which Palacios never received due to the manipulation of MSI Companies' financial records. For the same reasons the Court finds that McDonald did not breach the Employment Agreement, the Court cannot find by a preponderance of the evidence that a conversion occurred. The Court will therefore enter judgment in favor of McDonald.

### 6.    Defamation

"Defamation is a publication of a false statement of fact." *Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 87 (Nev. 2002). Statements of opinion cannot be defamation as a matter of law, because there is no such thing as a false idea. *Id.* at 88. Accordingly, "to prevail on a defamation claim, a party must show publication of a false statement of fact." *Posadas v. City of Reno*, 851 P.2d 438, 442 (Nev. 1993) (citation omitted). "[I]f the defamatory communication imputes a person's lack of fitness for trade, business, or profession, or tends to injure the plaintiff in his or her business, it is deemed defamation per se and damages are presumed." *Clark Cnty. Sch. Dist. v. Virtual Educ. Software, Inc.*, 213 P.3d 496, 503 (Nev. 2009) (quotation omitted).

The Palacios Parties' defamation claim centers on Bailes' statement that Palacios "abandoned" MSI Companies. As the Court explained *supra* in Section (IV)(B)(44), Palacios voluntarily resigned from MSI Companies. As such, the various statements Bailes made that Palacios "abandoned" MSI Companies were, in fact, true. The Palacios Parties rely on defamation per se for the presumption of damages, however, this theory fails as well because the Court cannot find by a preponderance of the evidence that

Bailes made a false or defamatory statement. Irrespective of whether the statement has to do with Palacios' business acumen, the core of a defamation claim is a false statement. The Court finds that since the statement on which the claim is premised was truthful, it fails as a matter of law. The Court will therefore enter judgment in favor of McDonald.

### 7.   Breach of Fiduciary Duty

The Palacios Parties assert that McDonald, as Director and majority shareholder of MSI Companies, breached a fiduciary duty to Palacios by: (1) directing Wishon to manipulate MSI Companies' financial records to ensure that Palacios did not receive bonuses under the Employment Agreement; (2) operating MSI Companies in such a way as to create liabilities for the Palacios Parties; (3) advising vendors and the Nevada State Contractor Board that Palacios abandoned MSI Companies; (4) failing to obtain licensing with the Nevada State Contractor's Board; and (5) terminating Palacios and closing the companies. (ECF No. 175 at 21:27-22:7.)

"[A] board's power to act on the corporation's behalf is governed by the directors' fiduciary relationship with the corporation and its shareholders, which imparts upon the directors duties of care and loyalty."[20] *Shoen v. SAC Holding, Corp.*, 137 P.3d 1171, 1178 (Nev. 2006) (citations omitted). "[T]he duty of care consists of an obligation to act on an informed basis; the duty of loyalty requires the board and its directors to maintain, in good faith, the corporation's and its shareholders' best interests over anyone else's

---

[20]To the extent the Palacios Parties argue that a fiduciary relationship arises from a "partnership" between McDonald and Palacios, the Court finds the relationship between the parties was not a "partnership" under Nevada law. *See* NRS § 87.070. Although Palacios held the position as President of MSI Companies, he was an employee of MSI Companies and received his compensation based on the Employment Agreement. Palacios' primary purpose was to "mentor and train McDonald and Bailes in the operation and management of the Company" for his two-year term of employment. (Exh. 30 at PLTF00469.) Moreover, Palacios testified that he was only President "on paper" and any "major decisions on behalf of the Company" could only be made by consensus approval of the Board of Directors, which included McDonald, Palacios, and Bailes. (Exh. 30 at PLTF00469; ECF No. 211 at 21:3-6.) Finally, Palacios never intended to form a "partnership" with McDonald. Palacios testified that it was solely McDonald's responsibility to loan MSI Companies money, and not his, because McDonald "understood that the deal was he was purchasing 100 percent of my company and I was just remaining for two years; that was my intention the whole time." (ECF no. 211 at 92:22-93:11.)

interests." *Id.* Balancing these duties "is the protection generally afforded to directors in conducting the corporation's affairs by the business judgment rule." *Id.* Under Nevada's business judgment rule "[d]irectors and officers, in deciding upon matters of business, are *presumed* to act in good faith, on an informed basis and with a view to the interests of the corporation." NRS 78.138(3) (emphasis added). Directors and officers will not be individually liable unless it is proven that the conduct constituted a breach of fiduciary duty and the breach "involved intentional misconduct, fraud or a knowing violation of law." NRS § 78.138(7).

The Palacios Parties fail to prove by a preponderance of the evidence that McDonald, as Director and majority shareholder of MSI Companies, breached the duties of care and loyalty. McDonald hired Palacios as President of MSI Companies specifically so he could act on a more informed basis. There is no evidence that McDonald operated MSI Companies in such a way as to create liabilities for the Palacios Parties. Rather, the evidence shows that McDonald steered MSI Companies in the direction that Palacios suggested based on his expertise in the field, and relied on Palacios to conduct the day-to-day management until McDonald and Bailes could learn how to operate and manage MSI Companies. The Palacios Parties fail to establish that McDonald had any obligation to loan MSI Companies money; nevertheless McDonald did loan MSI Companies at least $1.5 million over a two-year period and ensured that Palacios received his $12,500 monthly salary until May 24, 2008. Finally, even if there was a breach of fiduciary duty, the Palacios Parties fail to prove that the breach involved intentional misconduct, fraud, or a violation of law. The Court will therefore enter judgment in favor of McDonald.

### 8.    Negligence

To prevail on a negligence theory, a plaintiff must establish that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, (3) the breach was the legal cause of the plaintiff's injuries, and (4) the plaintiff suffered damages. *DeBoer v. Sr. Bridges of Sparks Fam. Hosp.*, 282 P.3d 727, 732 (Nev. 2012). Here, the Palacios Parties assert that McDonald, as Director of MSI Companies, negligently

caused MSI Companies to fail by: (1) failing to financially support MSI Companies; (2) "pulling off" jobs leading to MSI Companies losing accounts receivable; (3) manipulating MSI Companies' financial records; (4) Bailes' failure to obtain his contractor's license; and (5) terminating Palacios without having a qualified employee. (ECF No. 175 at 22:19-27.)

The Palacios Parties fail to prove by a preponderance of the evidence that McDonald, as Director of MSI Companies, breached any duty to the Palacios Parties. Although McDonald provided MSI Companies with financial support, the Palacios Parties fail to establish that he had any duty to do so in his position as Director of MSI Companies. To the extent that McDonald did "pull off" jobs, the Palacios Parties fail to rebut the presumption that McDonald did so in good faith with a view to the interests of the corporation and on an informed basis. *See Shoen*, 137 P.3d at 1184 (holding the business judgment rule "does not protect the gross negligence of uninformed directors and officers"). Finally, even if there was a breach of duty, the Palacios Parties fail to prove that the breach involved intentional misconduct, fraud, or a violation of law. The Court will therefore enter judgment in favor of McDonald.

### 9.    Indemnity/Declaratory Relief

The Palacios Parties assert that they are entitled to indemnification on the Nevada State Bank line of credit pursuant to the Stock Sale Escrow Instructions ("Escrow Agreement").[21] The Escrow Agreement states in pertinent part:

> (3) **STOCK SALE:** It is understood by both Buyer and Seller this is a Stock Sale only for SEVENTY FIVE PERCENT (75%) of all issued and outstanding shares of stock of those corporations as provided above. Buyer is assuming any liabilities, accounts payable, and accounts receivable, all of which remain with the respective corporation, unless specifically set forth herein.

(Exh. 507 at DEF00034–DEF00037.)

---

[21] The Nevada State Bank line of credit is the subject of a lawsuit in Nevada state court. The Court understands that there has already been a finding of liability against Palacios and the remaining issue is damages. The Palacios Parties seek indemnification for damages that arise from that lawsuit.

McDonald argues that this language in the Escrow Agreement covers only liabilities that "pre-existed" the sale of MSI Companies. The Palacios Parties appear to concede this point. They take the position that because MSI Companies used the Nevada State Bank line of credit to repay the Community Bank line of credit — which did "pre-exist" the sale of MSI Companies — that it should also be considered a "pre-existing" liability.[22] The Court disagrees.

The Community Bank line of credit was extinguished when MSI Companies repaid it using funds obtained from the Nevada State Bank line of credit. The Court agrees with McDonald's characterization of this transaction as a "re-finance" because the parties effectively created a *new* debt by repaying the existing loan.[23] Moreover, Palacios chose to personally guarantee the new Nevada State Bank line of credit. Nowhere in the Escrow Agreement did McDonald agree to indemnify Palacios for debts he personally guaranteed after the sale of MSI Companies. Accordingly, Palacios is not entitled to indemnification on the Nevada State Bank line of credit. The Palacios Parties cannot prevail on their declaratory relief claim.

### D.   Palacios Parties Third-Party Claims Against Bailes

#### 1.   Contractual Interference

To prevail on a claim for intentional interference with contractual relations, a plaintiff must establish: "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003). The element of intent requires more

---

[22]At trial Mr. Beasley, the Palacios Parties' attorney, described their position as such:

> Any debts that existed, Mr. McDonald was supposed to be responsible for all the liabilities. And so it's our position that … [the Community Bank line of credit] was rolled into the Nevada State Bank note, that line of credit.

(ECF No. 211 at 155:17–22.)

[23]The definition of "refinance" is "[a]n exchange of an old debt for a new debt . . . by repaying the existing loan with money acquired from a new loan." *Refinancing*, Black's Law Dictionary (8th ed. 2004).

than mere knowledge that the contract exists; instead, "the plaintiff must demonstrate that the defendant intended to induce the other party to breach the contract with the plaintiff." *Id.* at 1268. Here, the basis of the Palacios Parties' claim is that Bailes directed Wishon to adjust MSI Companies' financial records to deprive Palacios of the compensation and bonus under the Employment Agreement between McDonald and Palacios.

The Court cannot find by a preponderance of the evidence that Bailes committed intentional acts designed to disrupt the Employment Agreement. As explained *supra* in Section (IV)(F)(58), Bailes neither directed Wishon, nor formed any agreement with her, to adjust MSI Companies' EBIDTA or annual cash flow. The Court will therefore enter judgment in favor of Bailes.

### 2.      Remaining Claims

For the reasons explained *supra* in Sections (V)(C)(1), (5), and (6), the Court finds that the Palacios Parties fail to prove civil conspiracy, fraud, defamation, conversion, breach of fiduciary duty, and negligence claims against Bailes. The Court will therefore enter judgment in favor of Bailes on each of these claims.

### E.      Palacios Parties' Third-Party Claims Against Krick and UBB.

#### 1.      Breach of Fiduciary Duty

"A breach of fiduciary duty is analogous to fraud, and thus, Nevada applies the three-year statute of limitation set forth in NRS 11.190(3)(d)." *In re Amerco Derivative Litig.*, 252 P.3d 681, 703 (Nev. 2011). The statute of limitation for a breach of fiduciary duty will not commence to run until the aggrieved party knew, or reasonably should have known through the exercise of proper diligence, the facts giving rise to the breach. *Nevada State Bank v. Jamison Family P'ship*, 801 P.2d 1377, 1382 (Nev. 1990); *see Nevada Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1306 (9th Cir. 1992), *as amended on denial of reh'g* (Apr. 14, 1992).

The Palacios Parties point out that the existence of a fiduciary relationship may limit a plaintiff's duty of diligent inquiry into the facts because the plaintiff is entitled to

rely on the fiduciary's representations. *See Golden Nugget, Inc. v. Ham*, 646 P.2d 1221, 1223 (Nev. 1982) (citing *Bennett v. Hibernia Bank*, 305 P.2d 20, 33 (Cal. 1956)) ("[W]here a fiduciary relationship exists, 'facts which would ordinarily require investigation may not excite suspicion."). The Palacios Parties contend that because Palacios relied on Krick's representations that there were "guarantees" in place to ensure payment, the statute of limitations did not begin to run until he realized the information was either fraudulent or mistaken. The Palacios Parties insist that this occurred on September 27, 2011, when the Court granted summary judgment in favor of McDonald on the declaratory relief claim.

However, even when a fiduciary relationship exists, the plaintiff has a duty to investigate when "he has notice of facts sufficient to arouse the suspicions of a reasonable man." *Bennett*, 305 P.2d at 35; *accord Shupe v. Ham*, 639 P.2d 540 (Nev. 1982). Upon notice of sufficient facts, the plaintiff will be charged with knowledge of matters which would have been revealed through the exercise of proper diligence. *See Nevada Power*, 955 F.2d at 1306.

The Court finds that the Palacios Parties knew, or reasonably should have known through the exercise of proper diligence, the underlying allegations forming the basis of the claim on August 7, 2006, at the latest. The Palacios Parties allege that UBB breached its duty to act in their best interest through various omissions — failing to arrange the transaction so the Palacios Parties would be relieved of all liability for the Companies after the Closing; failing to ensure there was adequate security for the Note; failing to explain the terms of the Purchase Agreement and potential for liability; and failing to adequately advise Palacios that UBB could not perform a stock transaction.

Palacios should have known these facts from the Purchase Agreement. Palacios reviewed and signed the Purchase Agreement on August 3, 2006, and he reviewed and signed the Stock Pledge and the Note on August 7, 2006. All three instruments contain a term addressing liability in the event of default, which the Court previously held "is unambiguous in its provision that McDonald's liability for default during the first two years

40

of the note or for as long as the Trust was a shareholder of MSI was limited to the stock McDonald had purchased." (ECF No. 77 at 5:15-17.) Also unambiguous is the Note, which indicates that it is secured only by the Stock Pledge. Although Palacios testified that he was most concerned with securing payment on the Note and relieving his liability in MSI Companies, which he conveyed to UBB, the Purchase Agreement unequivocally guaranteed neither; and Palacios is presumed to know the contents of the contracts he signed. *See Campanelli v. Conservas Altamira, S.A.*, 477 P.2d 870, 872 (Nev. 1970) ("Ignorance through negligence or inexcusable trustfulness will not relieve a party from his contract obligations."). Thus, the Palacios Parties should have known that UBB breached the fiduciary duty no later than August 7, 2006, when Palacios executed the Purchase Agreement.

Even accepting that Palacios depended on Krick's representations, he still should have reasonably known the facts surrounding the breach through proper diligence. On August 7, 2006, Palacios acknowledged that UBB was not a licensed security broker and that he "did not seek to have [UBB] become involved in the sale of Company's shares of stock or other securities (equity)." (Exh. 803 at KRICK0124.) At the very least, this disclaimer should have aroused Palacios' suspicion, thereby provoking inquiry, that his unbridled reliance on Krick's representations was possibly erroneous, especially considering that UBB previously disclosed in May 2006 that it could not handle a stock transaction. Furthermore, although Palacios believed that UBB addressed his concerns, the terms of the sale remained essentially the same between May 2006, when Krick prepared the Proposed Basic Terms, and August 2006.

Palacios vaguely asserts that he believed the Employment Agreement "offset" some of the other terms of the sale. However, he specifically testified that the Employment Agreement was changed to alleviate his fear that McDonald could simply terminate his employment and refuse to pay on the Promissory Note — and "termination for cause" is precisely what the Employment Agreement addresses. To the extent that Krick mistakenly or fraudulently led Palacios to believe that the Employment Agreement

otherwise "offset" the provision addressing liability in the event of McDonald's default, no term in the Employment Agreement reflects such a representation. The fact that the Employment Agreement does not contain the assurances Krick made after May 2006, in conjunction with UBB's disclaimers, should have further caused Palacios to inquire whether UBB addressed his concerns as to payment and liability. As such, notwithstanding the fiduciary relationship with UBB, Palacios had sufficient notice of facts to "arouse the suspicions of a reasonable man" and provoke inquiry.

In sum, under these circumstances, Palacios knew, or through the exercise of proper diligence reasonably should have known, the facts surrounding the breach of fiduciary claim no later than August 7, 2006. Because the Palacios Parties filed the third party claim on October 22, 2010, it falls outside of the three-year statute of limitations and is barred as a matter of law. The Court will therefore enter judgment in favor of Krick and UBB.

### 2.    Negligence

A negligence claim is governed by a two year statute of limitations that commences to run when the aggrieved party knew, or reasonably should have known through the exercise of proper diligence, the facts giving rise to the damage or injury. NRS § 11.190(4)(e); *see Nevada Power*, 955 F.2d at 1306. Here, the Palacios Parties allege the same facts to support the negligence claim as they did for the breach of fiduciary duty claim. The negligence claim is similarly time barred.

### F.    Krick and UBB's Third-Party Counterclaim Against Palacios Parties

UBB asserts that they are entitled to attorney fees under NRS § 18.010 and attorney's fees and costs under the "Letter of Authorization" with the Palacios Parties. (ECF No. 177 at 12.)

UBB claims that attorney's fees are warranted under NRS § 18.010(2)(b) because the claims are time-barred. Section 18.010(2)(b) of the Nevada Revised Statutes gives the court discretion to award attorney fees to a prevailing party where the claim "was brought or maintained without reasonable ground or to harass the prevailing party." NRS

§ 18.010(2)(b). The court must determine if evidence in the record exists to support "the proposition that the complaint was brought without reasonable grounds or to harass the other party." *Kahn v. Morse & Mowbray,* 117 P.3d 227, 238 (Nev. 2005) (quoting *Semenza v. Caughlin Crafted Homes,* 901 P.2d 684, 687(Nev.1995)).

Here, although the Court has determined that the breach of fiduciary duty and negligence claims are time-barred, there is insufficient evidence of unreasonableness or intent to harass. The Palacios Parties' allegations were not groundless. Moreover, the statute of limitations issue was reasonably disputed and the Palacios Parties' arguments were not entirely meritless. Therefore, the Court will decline to award attorney's fees under NRS § 18.010(2)(b).

UBB additionally claims entitlement to indemnification of attorney's fees and costs under the "Letter of Authorization," which provides:

> [MSI Companies] agrees to hold Broker harmless against all losses, claims, damages, liability and expenses, including reasonable attorney's fees, which Broker may incur or which may be asserted against Broker as a result of the breach or alleged breach of the foregoing representation.

(Exh. 638.) The contract, and expressly the above provision, is an agreement between *MSI Companies* and UBB — not the Palacios Parties individually. Accordingly, UBB is not entitled to attorney's fees and costs from the Palacios Parties under the "Letter of Authorization."[24]

## VI.    CONCLUSION

McDonald and the Palacios Parties fail to establish their claims against each other and against others (Nelson, Bailes) by a preponderance of the evidence. The Palacios Parties' claims against UBB are time barred. UBB is not entitled to attorneys' fees. In sum, the Court finds in favor of the party defending the claims asserted against them.

---

[24]UBB and Krick also claim damages for breach of the "Authorization to Close Transaction, Release of All Contingencies Affidavit, Indemnification and Mutual Release Agreement." This is a different contract than the "Letter of Authorization" referenced in their trial brief. (Compare Exh. 804 with Exh. 638.) At trial, Krick and UBB provided no evidence to establish a breach of the "Authorization to Close Transaction, Release of All Contingencies Affidavit, Indemnification and Mutual Release Agreement." The Court will therefore dismiss the claim for failure to prosecute.

As to McDonald, the Court finds that he fails to establish his claims, except for his sixth claim for declaratory relief, against the Palacios Parties and Nelson. The Clerk is therefore directed to enter judgment in favor of McDonald on his sixth claim declaratory relief and in favor of the Palacios Parties and Nelson on all other claims asserted against them by McDonald.

As to the Palacios Parties, the Court finds that they fail to establish all counter claims and third party claims asserted against McDonald and Bailes. The Clerk is directed to enter judgment in favor of McDonald on the Palacios Parties' counter claims against him, and in favor of Bailes on the Palacios Parties' third-party claims against him.

As to Krick and UBB, the Court finds that the Palacios Parties' third party claims against Krick and UBB are time-barred. The Clerk is directed to enter judgment in favor of Krick and UBB. The Court further finds that Krick and UBB are not entitled to attorney's fees and costs from the Palacios Parties.

All remaining named Defendants, as described in this Order, and all remaining claims, counterclaims and third party claims are dismissed with prejudice.

The Clerk is instructed to close this case.

DATED THIS 23rd day of September 2016.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE